SIERRA CLUB, et al., Plaintiffs,

v.

George E. MARTIN, et al., Defendants.

and

Bert Thomas, et al., Defendant Intervenors.

No. CIV.A.1:96–CV–926TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 30, 1998.

Donald D.J. Stack, Stack & Associates, Atlanta, GA, Eric Eugene Huber, Earthjustice Legal Defense Fund, Inc., New Orleans, LA, for Sierra Club, Wilderness Society, Georgia Forestwatch, Inc., the Armuchee Alliance, Raburn County Coalition to Save the Forest, Inc., Friends of Georgia, Inc., plaintiffs.

James Randolph Schulz, Office of United States Attorney, Atlanta, GA, Lois J. Schiffer, phv/USAty, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Kelly E. Mofield, phv-DOJ, U.S. Department of Justice, Environment & Natural Resources Division, Franklin Station, Wildlife & Marine Resources Section, Stephen R. Herm, phv, U.S. Department of Justice, Environment & Natural Resources Division, Lisa A. Holden, phv-DOJ, U .S. Department of Justice, Environmental/Natu-

ral Resources Division, Washington, DC, for George G. Martin, in his official capacity as Forest Supervisor of the Chatahoochee and Oconee National Forests, Robert C. Joslin, Regional Forester of the United States Forest Service for Region Eight, United States Forest Service, Defendants.

Alexander Stephens Clay, IV, Ashley B. Watson, Kilpatrick Stockton, Atlanta, GA, Thomas R. Lundquist, phv, John A. Macleod, phv, Joseph M. Klise, phv, Crowell & Moring, Washington, DC, for Bert Thomas, Cook Brothers Lumber Co., Inc., Parton Lumber Co., Inc., and Thrift Brothers Lumber Co., Inc., Defendant-Intervenors.

ORDER

THRASH, District Judge.

This action challenges the approval by the United States Forest Service of seven timber cutting projects in the Chattahoochee National Forest in North Georgia. It is before the Court on the Motion for Summary Judgment [Doc. No. 54] of the Plaintiffs, and Cross–Motions for Summary Judgment [Doc. Nos. 62 and 63] by the Defendants and Intervenors. For the reasons set forth below, the Court denies the Plaintiffs' Motion for Summary Judgment and grants the Cross–Motions for Summary Judgment of Defendants and Intervenors.

I.  INTRODUCTION

The Chattahoochee National Forest consists of approximately 750,000 acres of public land spread across North Georgia. The Forest Service has approved timber cutting projects for seven sites in the Chattahoochee National Forest. For each project, the Forest Service proposed to enter into a contract to sell the timber to a private contractor. The contractor would then cut the timber and remove it from the National Forest. The seven timber cutting projects involve cutting timber on 1,797 acres of land in the Chattahoochee National Forest. The Plaintiffs have various recreational, aesthetic, business and/or environmental interests that will be affected by the timber cutting projects. The Plaintiffs' interests are within the zone of interests protected by the pertinent

statutes and are not merely generalized grievances shared by the citizenry at large. *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Consequently, they have standing to assert these claims. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562–563, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The Plaintiffs' claims implicate multiple statutes, including the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. § 528 *et. seq.,* the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et. seq.,* the National Forest Management Act of 1976, 16 U.S.C. § 1600 *et. seq.,* the Endangered Species Act, 16 U.S.C. § 1531 *et. seq.,* and the Administrative Procedure Act, 5 U.S.C. § 501 *et. seq.* If the Plaintiffs' position prevails, timber cutting in the Chattahoochee National Forest and the Oconee National Forest will cease for the foreseeable future, notwithstanding the Congressional mandate that the National Forests are to be managed for timber production as well as recreational and other uses. If the Defendants and the Intervenors prevail, numerous stands of 60 to 90 year old trees will be cut down and tons of dirt, rock and debris will be washed into the streams of North Georgia. Plaintiffs claim that the resulting injury to the environment and wildlife of the Chattahoochee National Forest will be irreparable.

The Southern Appalachia region is one of the most diverse in terms of plant and animal life of the entire North American continent. More than 2000 plant and 500 animal species live in the Chattahoochee National Forest. Due to the wide range of topography, the region is home to plant and animal species found as far south as the coastal lowlands and as far north as the forests of Canada. The forests of Southern Appalachia were virgin hardwood forests when first seen by Europeans. Agriculture, logging, reforestation and the American chestnut blight all in turn transformed these forests into what they are today. The majority of the Chattahoochee National Forest was cut for timber between 1880 and 1930. As a result, natural old growth stands of long life tree species such as oak usually occur on steep, rough land

that was not logged or logged only selectively. There are 186,726 acres of the Forest that are set aside as old growth areas that are not available for timber harvesting. In all, 27 percent of the Forest is withdrawn from timber harvesting.

The Chattahoochee and Oconee National Forests are home to many species of threatened and endangered plants and wildlife. Approximately 175 species of plants, birds, mammals, reptiles, amphibians, insects, mussels and fish are included on state or federal lists of threatened and endangered species or are considered as "sensitive species" by the Forest Service. This includes plants such as the small whorled pogonia, purple sedge, northern pitcher plant, pink ladyslipper, snowy hydrangea, Virginia bluebell and dwarf ginseng. Other threatened, endangered or sensitive species include the bald eagle, the peregrine falcon, the red-cockaded woodpecker, the South Appalachian cottontail, the pygmy shrew, Sherman's fox squirrel, the bog turtle, the green salamander, the blue shiner, the amber darter and the brook trout.

The Chattahoochee National Forest has about 19,000 lakes and 1500 miles of perennial trout streams. The annual precipitation varies from 54 inches in the foothills to 80 inches in the extreme northeastern mountains. Most of the Chattahoochee National Forest exhibits the rugged mountainous terrain typical of the Southern Appalachians. A small area near Toccoa is classified as Upper Piedmont. A small area near Dalton is classified as Ridge and Valley. Most of the Chattahoochee National Forest is of an Appalachian oak forest type. Major tree species include white and red oak, hickory, yellow poplar, shortleaf pine, Virginia pine and Eastern white pine. The Oconee National Forest is one seventh the size of the Chattahoochee National Forest, but provides about one third of the timber cut from both forests. This is due to the combination of good growing conditions and easy access. The Oconee National Forest is predominantly a yellow pine forest.

Approximately 45 percent of the land within the boundary of the Chattahoochee National Forest is publicly owned. Typically, the publicly owned National Forest lands are on the mountains and ridgetops with private land concentrated in the developed valleys. Rabun County contains the highest percentage of National Forest land with 63 percent of its area in federal ownership. It is not uncommon to have small isolated tracts of the National Forest fully or partially surrounded by private land. Similarly, there are many small scattered private tracts surrounded by National Forest ownership. Increasing public ownership within the National Forest boundary is accomplished through land acquisition, land exchanges and land donations. Features of national significance in the Chattahoochee National Forest include the Chattooga National Wild & Scenic River, the Appalachian Trail, Plott Cove Research Natural Area, Cohutta Wilderness Area, Ellicott Rock Wilderness Area and the Southern Nantahala Wilderness Area.

The Chattahoochee National Forest provides recreational activities ranging from modern campgrounds to wilderness areas. There are 34 developed recreation areas in the Forest. These vary from roadside overlooks and picnic areas to large campgrounds offering swimming, boating, picnicking and camping. There are 600 miles of hiking trails. The beginning point and 79.5 miles of the Appalachian Trail are in the Chattahoochee National Forest. There are 13 Wildlife Management Areas. They encompass 47 percent of the land in the Chattahoochee National Forest. They are managed by the Georgia Department of Natural Resources Game & Fish Division. The environment of the Chattahoochee National Forest is threatened not only by logging but by over use of some of these recreational sites. For example, the Forest Service road to Earl's Ford (a popular fishing spot and access point for boaters) is heavily used, severely eroded and is a source of sediment laden runoff into the Chattooga River.

This case presents the clash of two visions of the appropriate use of the Chattahoochee National Forest. Mr. Edmon Nicholson has submitted an affidavit in support of the Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. He has lived in Atlanta for eight years. He

spends much of his free time in the Chatta-hoochee National Forest. He enjoys back-packing, camping, canoeing, swimming, fly-fishing for trout, bird watching and nature study. His favorite river for fishing is the Chattooga National Wild and Scenic River. The Chattahoochee National Forest provides him with the opportunity to fish for trout in clear, cold mountain streams while enjoying the scenic beauty of the North Georgia mountains.

Mr. Nicholson does not always get the opportunity to enjoy the Forest as he wishes because of conflicting uses. He has seen the West Fork of the Chattooga River when it is unfishable after a moderate rainstorm due to heavy discoloration of the water from runoff. One of the tributaries of the West Fork is Big Creek. The last time that Mr. Nicholson fished Big Creek, a light rain of less than two hours duration made the stream too muddy to fish because of runoff from a logging road. He contrasts these conditions with Dukes Creek or the Jacks River in the Cohutta Wilderness area where the water remains clear even after heavy rains because they are not affected by runoff from logging activities. Mr. Nicholson is concerned that six miles of new logging roads from the Compartment Five project will dump an additional 63.6 tons of sediment into tributaries of the Chattooga River.[1]

A contrasting vision of the appropriate use of the Chattahoochee National Forest is presented by Mr. Bert Thomas, one of the Intervenors. He lives in Morgantown, Georgia. He and his family make their living cutting timber. He has been involved in the timber business in North Georgia for over 20 years. He has ten employees who work directly for him. In addition, there are five contract truckers who rely upon his business for a substantial portion of their work. Approximately 85 percent of his business comes from the National Forest Timber Sale Program. A reliable timber sale program for the Chattahoochee National Forest is critical to the future of his business.

Mr. Thomas is the purchaser of the Big Net and Upper Swallows Timber Sales. He was the high bidder for both projects. When he submitted his bid for the Big Net tract, he was required to furnish a cash bond of $3000 to the Forest Service and an initial down payment of $2800. Mr. Thomas had cut approximately 20 percent of the timber in the Big Net project when he stopped work due to this litigation. When he submitted his bid for the Upper Swallows Timber Sale, he was required to furnish a cash bond of $2000 to the Forest Service and an initial down payment of $1500. He had cut approximately two thirds of the timber for this project when he stopped work due to this litigation.

Mr. Thomas finances his business from log sales and lines of credit from two local banks. The lines of credit are secured by his equipment, his home and 70 acres of timberland that he owns. His bankers will not loan him any additional money without additional collateral. The delay in completing the timber projects has seriously jeopardized his business and the financial security of his family and employees. If further work is prohibited in the two projects, he will lose (or may have already lost) a $90,000 sale of special order veneer logs. People like Bert Thomas and the other Intervenors appreciate the beauty of the North Georgia mountains and the Chattahoochee National Forest as much as anyone. However, for them, the National Forests are not only a source of aesthetic satisfaction and recreational opportunities. To them, the National Forests are their live-

---

1. The sedimentation effects are derived from the Computerized Project Analysis of Timber Sales ("COMPPATS") computer program utilized by the Forest Service. The software program may overestimate the sedimentation effects for several reasons. The software program assumes that all activities are carried out in one year although the actual timber cutting may be spread out over two or more years. The total is the sedimentation yield over a ten year period. The results are also presented as if the entire project area is drained by one stream which is rarely the case. In addition, the COMPPATS projections do not adequately account for the effects of mitigation measures currently used. For these reasons, the COMPPATS sedimentation figures should be viewed as the "worst case" rather than the average or actual result. The 63.6 tons of sediment cited by Mr. Nicholson includes 27 tons from existing roads and normal geological erosion. Therefore, the net increase in sedimentation in the "worst case" is 36 tons over a ten year period.

lihood and their way of life. Their work is hard and dirty, but it is honest and honorable labor.

The events leading to the clash of these two visions of the appropriate use for the Chattahoochee National Forest began in 1985. At that time, the Forest Service adopted the Forest Plan and the Final Environmental Impact Statement for the Chattahoochee and Oconee National Forests. That Plan authorized timber cutting in the areas of the National Forest where the seven projects are located. Then in 1991, the Forest Service began proposing the seven timber cutting projects that are at issue in this litigation. For each project, the Forest Service performed an Environmental Assessment in which an interdisciplinary team of Forest Service employees considered the proposed timber sales and possible alternatives. After the Forest Service determined that the proposed projects would have no significant environmental impact, the projects were put out for bids. Prior to the filing of this action, four of the projects were awarded to individual purchasers, the first on August 21, 1995. Logging began on three of the projects before there was a voluntary stay on April 19, 1996, after this lawsuit was filed. The remaining projects were scheduled to have bids opened in the Summer and Fall of 1996.

The Dunaway Gap project involves the logging of 557 acres in the Coosa River Basin. It involves the construction of 4.1 miles of road. Tibbs Trail is a project to log 365 acres. It will involve the construction of 6.4 miles of road. The Upper Swallows Creek project involves the logging of 83 acres in the Hiawassee River Basin. It involves the building of 1.4 miles of road. The Compartment 59 project is a project to log 154 acres in the Chattooga River Basin. One mile of road will be built. The Compartment 05 project is a project to log 623 acres in the Chattooga River Basin. It will involve building 5.3 miles of roads. The Big Net project involves logging 115 acres in the Hiawassee River Basin. Approximately one mile of road is to be built. The South Corn Ridge project is a project to log 164 acres in the Hiawassee River Basin. It will require the building of 1.6 miles of road. The timber cutting and road building activities will result in many tons of sediment being washed into nearby streams. The trees that will be cut in these projects include 60 to 70 year old white pines, 60 to 80 year old scarlet oaks, 80 to 90 year old shortleaf pines, 60 year old white oaks, red oaks and hickory trees, 60 to 70 year old yellow poplars and 70 to 80 year old Virginia pines.

## II. HISTORY OF THIS LITIGATION

This action was filed on April 17, 1996. The Plaintiffs are nationwide environmental organizations, such as the Sierra Club and The Wilderness Society, and local organizations concerned with conservation and protection of the environment in North Georgia. In their Complaint, the Plaintiffs alleged violations of the Clean Water Act, 33 U.S.C. § 1251 *et. seq.;* the Migratory Bird Treaty Act, 16 U.S.C. § 703; the National Forest Management Act; the Administrative Procedure Act and the implementing regulations of the statutes. The Plaintiffs sought temporary and injunctive relief to prevent the Forest Service from proceeding with the seven timber cutting projects. Plaintiffs alleged that without such relief, the Forest Service "will commence tree cutting and road building, with resultant discharge of pollutants to water; death of migratory birds; and adverse affect on designated sensitive species." (Complaint, ¶ 10).

With respect to the Clean Water Act, Plaintiffs claimed that the construction of logging roads and other timber cutting activities would result in the discharge of sediment into nearby streams and that this discharge of sediment constitutes the discharge of unpermitted pollutants in violation of the Act. (Complaint, ¶¶ 45–75). With respect to the Migratory Bird Treaty Act, the Plaintiffs claimed that timber cutting, road building and related activities will kill young migratory song birds and cause adult birds to abandon their nesting sites in violation of the Act. (Complaint, ¶¶ 76–87). With respect to the National Forest Management Act, the Plaintiffs claimed that the Forest Service approved the seven timber projects without having adequate quantitative population data

as to "sensitive species" as required by the Act and the implementing regulations. (Complaint, ¶¶ 88–106). The Plaintiffs further claimed that the Forest Service approval of the seven timber projects was unlawful, arbitrary and capricious, and an abuse of discretion in violation of the Administrative Procedure Act. (Complaint, ¶ 106).

Plaintiffs moved for a Temporary Restraining Order and a Preliminary Injunction. In support of this motion, Plaintiffs submitted a copy of a Freedom of Information Act (5 U.S.C. § 552 et. seq.) request served upon the Forest Service. The Freedom of Information Act request sought documents with "population data" on four species of birds, six species of mammals, four species of reptiles, three species of amphibians, and 26 species of fish listed by the Forest Service as "sensitive species." In addition, the Freedom of Information Act request asked for documents with "population trend data" on the identified species. The Chattahoochee National Forest Supervisor responded with a letter in which he stated that the Forest Service had few documents which would be considered population data for the species in question. He also stated that the Forest Service had not conducted any population trend analysis for any of the listed species. He identified one mammal, two reptiles and three amphibians as species for which the Forest Service had some population data. The Plaintiffs rely heavily upon this response to the Freedom of Information Act request in arguing that the Forest Service has not complied with its own regulations in approving these seven timber sales.

In support of their motion for equitable relief, Plaintiffs asserted violations of the Clean Water Act, the Migratory Bird Treaty Act and the National Forest Management Act. With respect to the Clean Water Act, Plaintiffs claimed that the discharge of tons of rock and sand into nearby streams and rivers constitutes unpermitted discharge of pollutants in violation of § 301 of the Act, 33 U.S.C. § 1311. (Plaintiffs' Brief, pp. 7–8). The Migratory Bird Treaty Act makes it unlawful "at any time, by any means, or any manner" to kill migratory birds. 16 U.S.C. § 703. The Plaintiffs alleged that cutting timber and related activities in the seven project areas will kill many migratory songbirds in violation of the Act. (Plaintiffs' Brief, p. 9). Finally, Plaintiffs alleged that the Forest Service failed to follow its own regulations regarding the availability of quantitative population data for sensitive species in approving the seven timber cutting projects. Plaintiffs identified 36 C.F.R. §§ 219.12(d), 219.19, 219.26 and Forest Service Manual §§ 2670.5 and 2672.41 as the regulatory provisions that were violated. By means of selective quotation from these regulations, Plaintiffs argued that the Forest Service was required to have quantitative population data, including "population trend analysis," for each sensitive species in the Chattahoochee National Forest before it could approve the seven timber sales. (Plaintiffs' Brief, pp. 11–12).

Plaintiffs argued that a reduction of timber cutting in the National Forests of Southern Appalachia would not adversely affect the nation's timber supply. The National Forests contain 2.6 million acres of timberland, or about 18 percent of the timberland in the region as a whole. The National Forests have supplied only ten percent of the timber harvested in the Southern Appalachia region since 1980. In Georgia, of the 1,302 million cubic feet of timber cut from 1980 through 1993, only 6.6 million cubic feet (0.5%) came from National Forest lands.

Plaintiffs do contend that the seven timber cutting projects will damage the environment, kill migratory song birds and reduce the diversity of plant and animal species in the Chattahoochee National Forest. In support of their Motion for a Temporary Restraining Order and a Preliminary Injunction, the Plaintiffs submitted the affidavit of Dr. J. Christopher Haney, a zoologist currently employed as an Adjunct Research Associate at the North Carolina State Museum of Natural Sciences. Dr. Haney states that the Chattahoochee and Oconee National Forests are home to numerous species of neotropical migratory birds. These birds typically winter in Mexico or the Caribbean and spend the nesting season, April through August, in these forests. He states that the population of these birds is declining. He

calculates that the seven timber projects will result in the destruction of a low of .848 broods to a high of 2,840 broods. He calculates that a low of 3,431 to a high of 15,794 birds will be "affected" such as displacement of adult birds to other nesting sites.

The Plaintiffs also submitted the affidavit of Barry Sulkin regarding the erosion and sedimentation of nearby streams caused by timber cutting and related activities. He states that the 275 tons of sediment from the seven sale areas and 155 tons of sediment from construction of logging roads will likely have long term detrimental impacts to area streams and rivers. Sediment in a stream has a smothering effect that can kill the bottom dwelling organisms that are food for fish and other wildlife. Eggs of fish and aquatic organisms can also be smothered by sediment. Organic matter created by tree cutting that is washed into a stream will decompose in the water, consuming the dissolved oxygen that fish and aquatic organisms require for survival. He states that Best Management Practices relied upon by the Forest Service and its contractors to prevent erosion and sedimentation are not always followed and are not an adequate substitute for the permitting process of the Clean Water Act.

The Defendants answered and denied the material allegations of the Complaint. They filed the Administrative Record and opposed the Motion for a Temporary Restraining Order and a Preliminary Injunction. With respect to the Clean Water Act claims, they pointed out that the regulations issued by the Environmental Protection Agency exclude natural runoff due to "harvesting operations, surface drainage, or road construction and maintenance" associated with timber cutting from the definition of "point sources" that are required to have a permit. *See* 40 C.F.R. § 122.27(b). (Defendant's Brief, pp. 11–12). With respect to the Migratory Bird Treaty Act, the Defendants argued that there is no private right of action against the government under the Act. (Defendants' Brief, pp. 16–17). Finally, the Defendants denied that the Forest Service regulations required them to have population inventories for all sensitive species before approval of the seven timber cutting projects. (Defendants' Brief, pp. 26–29). Defendants, therefore, contended that there was insufficient likelihood of success on the merits for the Court to issue injunctive relief.

The Forest Service submitted the affidavit of Ray M. Ellis, Natural Resources Staff Officer for the Chattahoochee/Oconee National Forest, with respect to the sedimentation effect of the seven timber projects. He states that the timber purchasers for these projects may be involved in the construction of new roads, the reconstruction of existing roads, or the creation of temporary roads to allow access to the timber. The timber purchasers are required to comply with contractual specifications for erosion control and water quality. These Best Management Practices are designed to limit as much as possible the discharge of soil and rock into nearby streams. He states that the effect of using Best Management Practices is that the sedimentation effects that do occur are usually only slightly larger (typically about 7%) than would have occurred if there was no timber cutting activity. Mr. Ellis claims that reconstruction of logging roads in accordance with Best Management Practices has the effect of reducing the amount of erosion and sediment deposition to levels significantly below that prior to the timber sales. After the timber is cut, Mr. Ellis states that the timber purchasers are required to close temporary roads and take a number of measures to control erosion and insure water quality. Temporary roads are scarified, seeded, fertilized and mulched to encourage germination of grasses and to minimize erosion. He claims that the vast majority of road building in the seven projects will be for temporary roads and that the deleterious effects on nearby streams from sedimentation will be temporary and minimal. The sediment that does reach a stream is quickly flushed downstream. According to Mr. Ellis, any sediment reaching the Chattooga River has been diluted to several thousandths of its original concentration.

The Forest Service has also submitted the affidavit of Gaylord Morris, the Forest Wildlife Biologist for the Chattahoochee/Oconee National Forest from 1989 through 1995.

He states that Dr. Haney has vastly overstated the loss of migratory songbirds that will be caused by the seven timber cutting projects. He also states that the effect upon migratory songbirds from timber cutting is *de minimis* compared to the effects of agricultural activity, tornadoes, hurricanes, wild fires, microbursts and droughts that destroy wild birds. He also addressed the claim of the Plaintiffs that the seven timber cutting projects will result in less "wildlife diversity." Mr. Morris contends that the projects will result in an increase in diversity of both wildlife species and habitats. He states that adding a grass and shrub component in an area dominated by mature forests will provide additional habitat for species such as the redtail hawk that hunt their prey in forest openings, and prairie warblers, indigo buntings and yellow-breasted chats that feed and nest near forest openings. He states that at any point in time, less than five percent of the National Forest is in the early successional (0–10 year age class) condition. Thus, he states that there is minimal early successional habitat available for those species dependent upon openings in the forest canopy for hunting, nesting and brood rearing habitat. On the other hand, habitat for species that depend upon mature forests is available in abundance (95 percent of the National Forest land).

After the Complaint was filed, the Defendants and the timber purchasers agreed to a voluntary stay of activities in the seven projects. The Court scheduled oral argument for May 1, 1996. On April 26, 1996, the Southern Timber Purchasers Council, Mr. Bert Thomas, Cook Brothers Lumber Company, Inc., Parton Lumber Company, Inc., and Thrift Brothers Lumber Company, Inc. filed a Motion to Intervene on the Side of the Defendants. They are representatives of the southeastern timber industry who harvest timber in the Chattahoochee and Oconee National Forests. They claim that their legal and economic interests would be adversely affected by the relief requested by Plaintiffs. The Motion to Intervene was granted as to all but the Southern Timber Purchasers Council.

On May 8, 1996, this Court granted Plaintiffs' Motion for a Preliminary Injunction. The Court held that Forest Service approval of the timber cutting projects violated the Migratory Bird Treaty Act, and, therefore, was unlawful within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The Court reserved ruling upon the Clean Water Act and National Forest Management Act claims. The Intervenors and the federal Defendants appealed the Preliminary Injunction Order to the Court of Appeals for the Eleventh Circuit. The Court of Appeals reversed, holding that the Migratory Bird Treaty Act does not apply to federal agency actions that result in the death of migratory birds or the destruction of their nests. *Sierra Club v. Martin,* 933 F.Supp. 1559 (N.D.Ga.1996), *reversed* 110 F.3d 1551 (11th Cir.1997). Accordingly, Defendants' and Intervenors' motions for summary judgment on the Migratory Bird Treaty Act claim should be granted.

While the appeal to the Eleventh Circuit was pending, this Court granted the Plaintiffs' Motion for a Preliminary Injunction on their claims pursuant to the National Forest Management Act and the National Environmental Policy Act. The Court concluded that the Plaintiffs would ultimately prevail upon their claims that the Defendants violated the National Environmental Policy Act, the National Forest Management Act, the Forest Service regulations implementing the National Forest Management Act and the Chattahoochee National Forest Land Resource Management Plan itself. *Sierra Club v. Martin,* 1996 WL 452257 (N.D.Ga.1996). That Order was not appealed. Count I of the Plaintiffs' Complaint containing their Clean Water Act claims was voluntarily dismissed. After discovery, the Plaintiffs moved for summary judgment. The federal Defendants and the Intervenors filed crossmotions for summary judgment. On August 15, 1997, this case was one of almost 300 open civil cases that were reassigned to the undersigned upon his appointment to the United States District Court for the Northern District of Georgia.

In support of their motion for summary judgment, the Plaintiffs rely upon the

Court's previous Orders granting their motions for preliminary injunctive relief. They contend that the findings of fact and conclusions of law of the prior Orders mandate a final judgment in their favor. However, findings of fact and conclusions of law reached at the preliminary stages of this litigation do not bind the Court on final disposition of the case on the merits. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *E. Remy Martin & Co., S.A. v. Shaw–Ross Intern. Imports, Inc.,* 756 F.2d 1525, 1528 (11th Cir.1985). In the Court's view, its duty was to engage in a *de novo* review of the entire file, including the Administrative Record, in order to arrive at a final decision on the merits of this case. That is what the Court has done. In addition, the Court concludes that the previous Orders are inconsistent with the weight of authority that has developed during the pendency of this litigation. Finally, the Court's prior conclusion that the Plaintiffs were likely to succeed on the merits of their Migratory Bird Treaty Act claim has been overruled by the Eleventh Circuit. For the reasons set forth below, the Court feels compelled to reach a different conclusion from that of the Court in ruling upon the preliminary injunction motions.

In a Motion for Leave to File Supplemental Brief filed on November 10, 1997, Plaintiffs argue that the seven timber projects violate that National Forest Management Act provision that requires that even-aged timber cutting (also known as "clear cutting") is to be used only when it is "consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource[es]." 16 U.S.C. § 1604(g)(3)(F)(v). Plaintiffs cite the recent decision in *Sierra Club v. Glickman,* 974 F.Supp. 905 (E.D.Tex.1997). Until this pleading was filed, Plaintiffs' only claim regarding this section of the statute was that the Forest Service violated it by killing migratory birds in violation of the Migratory Bird Treaty Act. (Amended Complaint, ¶ 107). That claim has no merit in view of the ruling by the Eleventh Circuit in this case. The Court finds that the Plaintiffs failed to raise this new claim in a timely fashion before this Court. *See U.S. v. L.A.*

*Tucker Truck Lines, Inc.,* 344 U.S. 33, 37–8, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Glisson v. U.S. Forest Service,* 55 F.3d 1325, 1326 (7th Cir.1995); *Sharps v. U.S. Forest Service,* 28 F.3d 851, 854–55 (8th Cir.1994). Therefore, this claim will not be considered and the Motion for Leave to File Supplemental Brief [Doc. No. 84] is DENIED.

## III. NATIONAL FOREST LEGISLATION AND REGULATIONS

Congress passed the Organic Administration Act of 1897 in order to give direction for the management of forest reserves on federally owned land. In 1905, Congress transferred virtually all administrative responsibilities for the nation's forest reserves to the Department of Agriculture. Shortly thereafter, the Division of Forestry (headed by Gifford Pinchot) was renamed as the Forest Service and the forest reserves were designated as National Forests. Charles F. Wilkinson and H. Michael Anderson, *Land and Resource Planning in the National Forest,* 64 Or.L.Rev. 1, 18 (1985) [hereinafter cited as "Wilkinson & Anderson"]. Pinchot was an innovative leader who believed that planning would allow the use and preservation of all of the resources of the National Forests. He required planners to prepare detailed inventories, to monitor the condition of the reserves, determine sustainable use levels, and to exclude specific areas from certain uses where necessary to protect the watershed and other resources. *Id.* at 23. These were the building blocks of "scientific forest management."

Prior to the 1950s, the Forest Service was able to manage the National Forests without significant controversy. Management of range, timber and non-commercial resources did not often interfere with each other. *Id.* at 28. This changed after World War II due to the explosion of demand for timber and an equally large increase in recreational use of the National Forests.

During the late 1950s, the agency was under increasing pressure to change its management policies. Lumber interests sought further increases in the allowable rate of timber cutting while preservation

interests urged legislation to prohibit the agency from harvesting or developing the remaining wilderness in the national forests. The agency responded to these pressures for 'overuse' and 'single use' by proposing legislation mandating multiple use. *Id.* at 29. The result was the Multiple–Use Sustained–Yield Act of 1960. The Act provided in part that: "It is the policy of the Congress that the National Forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. In other words, the Forest Service was directed to manage the National Forests for conflicting and sometimes opposing uses. The Act gave no clue as to how to reconcile these conflicts. Wilkinson & Anderson, p. 286.

During the 1960's, the Forest Service continued to increase timber sales and expanded the use of clear cutting. Wilkinson & Anderson, p. 41. Environmentalists claimed that the Forest Service was destroying the National Forests in order to satisfy timber interests. The lawsuits began. In 1975, the Court of Appeals for the Fourth Circuit held that clear cutting was prohibited by the 1897 Organic Act that authorized the Forest Service to sell dead or mature trees that had been marked and designated before sale. *West Virginia Division of Izaak Walton League of America. v. Butz*, 522 F.2d 945, 948 (4th Cir.1975). This spurred intense debate in Congress regarding the timber harvesting policies of the Forest Service. As a result of that debate, the National Forest Management Act of 1976 was passed and signed into law. Wilkinson & Anderson, pp. 40–42.

The National Forest Management Act provided that the National Forests would continue to be managed through "coordination of multiple-use and sustained-yield opportunities as provided in the Multiple–Use Sustained–Yield Act of 1960..." 16 U.S.C. § 1600(3). *See also* 16 U.S.C. § 1607. The Act provided that the Forest Service would develop national forest system land and resource management plans for each unit of the national forest system. The land resource management plans were to be prepared by interdisciplinary teams "based on inventories of the applicable resources of the forest..." 16 U.S.C. § 1604(f)(3). The Forest Service was directed to promulgate regulations setting out the "process for the development and revision of the land management plans...." 16 U.S.C. § 1604(g). The regulations were to specify procedures for complying with the National Environmental Policy Act, including direction on when and for what plans an environmental impact statement should be prepared. 16 U.S.C. § 1604(g)(1). The regulations were to specify guidelines (1) for the identification of the suitability of lands for resource management; (2) provide for obtaining inventory data on the various renewable resources, soil and water; and (3) provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives. 16 U.S.C. § 1604(g)(2–3).

The Act also stated that forest system regulations should be adopted to insure that timber will be harvested from forest system lands only where (1) soil, slope or other watershed conditions will not be irreversibly damaged; (2) there is assurance that harvested areas can be adequately restocked within five years; (3) protection is provided for streams, stream banks, shorelines, and other bodies of water where timber harvesting is likely to seriously and adversely affect water conditions or fish habitat; and (4) the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber. 16 U.S.C. § 1604(g)(3)(E). The statute also required the adoption of guidelines that would restrict clear cutting in some circumstances. 16 U.S.C. § 1604(g)(3)(F). The statute further provided that resource plans, permits, contracts and other instruments for the use and occupancy of national forest system lands "shall be consistent with the land management plans." 16 U.S.C. § 1604(i).

The Act directed the Secretary of Agriculture to appoint a committee of scientists to assist in the adoption of the regulations. 16 U.S.C. § 1604(h)(1). The regulations adopted pursuant to the National Forest

Management Act are set forth in 36 C.F.R. § 219.1 *et seq.* The regulations are not models of clarity. Indeed, they provide a persuasive argument against allowing a committee of scientists to draft regulations having legal consequences. In a very real sense, the Forest Service has brought this litigation upon itself by imposing upon itself the broad, sweeping and extravagantly general duties and responsibilities set forth in the regulations.[2] The Plaintiffs' principal claim in this case is that the Forest Service has acted arbitrarily and capriciously by failing to follow its own regulations in approving the seven timber sales.

The Plaintiffs rely upon four sections of the regulations in arguing that the Forest Service was required to conduct population inventories and trend analyses for sensitive species before approving the timber sales. The regulations will be examined individually to determine (1) whether the regulation applies to a site-specific decision such as approval of a timber sale, and (2) whether the regulation requires the sort of quantitative population data and trend analysis demanded by Plaintiffs.

■ Plaintiffs first rely upon a portion of 36 C.F.R. § 219.12(d) in support of their argument that population inventories and population trend analyses for sensitive species were required prior to approval of the timber sales. In order to address this argument, the regulation as a whole must be examined. Section 219.12 is entitled: "Forest Planning–Process.". Subsection (a) states:

> General requirements. The preparation, revision, or significant amendment of a forest plan shall comply with the requirements established in this section. The planning process includes at least those actions set forth in paragraphs (b) through

(k) of the section. Some actions may occur simultaneously, and it may be necessary to repeat an action as additional information becomes available. The environmental impact statement for each forest plan shall be prepared according to NEPA procedures. To the extent feasible, a single process shall be used to meet planning and NEPA requirements.

36 C.F.R. § 219.12(a). Subsections (b) and (c) deal with the planning process and criteria. Subsection (d) then provides as follows, with the portions relied upon by Plaintiffs italicized:

> Inventory Data and Information Collection. *Each Forest Supervisor shall obtain and keep current inventory data appropriate for planning and managing the resources under his or her administrative jurisdiction.* The supervisor will assure that the interdisciplinary team has access to the best available data. *This may require that special inventories or studies be prepared.* The interdisciplinary team shall collect, assemble, and use data, maps, graphic material and explanatory aids, of a kind, character, and quality, and to the detail appropriate for the management decisions to be made....

36 C.F.R. § 219.12(d) [emphasis added].

This regulation is fraught with ambiguity. However, it appears to the Court that it was intended to apply only to the process of preparing the Land Resource Management Plans required by Section 6 of the National Forest Management Act, 16 U.S.C. § 1604(a). The regulation begins with the explicit statement that it governs the "preparation, revision or significant amendment of a forest plan." It then describes the planning process and the criteria to guide the planning process. Subsection (i) provides that the

2. During the notice and comment period, one of the criticisms of the proposed regulations was lack of specificity. The Committee of Scientists responded as follows:

> The degree of specificity of the draft regulations has been hotly debated. We conclude that the regulations do lack specificity in many key areas. We recommend that they be specific in establishing the principles of land management planning and the process to be used in applying these principles. We recommend,

> however, that the regulations not be specific with regard to prescriptions for on-the-ground management problems.

Final Report of the Committee of Scientists, 44 Fed. Reg. 26599 (May 4, 1979). This statement certainly supports the Court's conclusion, discussed below, that the regulations at issue in the case apply to the preparation and revision of forest plans and not to site-specific decisions such as individual timber sales.

Forest Supervisor shall recommend to the Regional Forester a preferred alternative in the "proposed plan." Subsection (j) provides that the Regional Forester "shall review the proposed plan and final environmental impact statement and either approve or disapprove the plan in accordance with § 219.10(c)." Subsection (k) sets forth the monitoring requirements to be identified in the forest plan.

Subsection (d) of 36 C.F.R. § 219.12 does state that the Forest Supervisor shall obtain and keep current inventory data appropriate for "planning and managing" the resources under his or her jurisdiction. This vague and ambiguous prescription may be construed to apply to site-specific decisions such as timber sales because of the inclusion of the term "managing" in addition to "planning." However, even assuming that subsection (d) applies to a decision to sell a tract of timber, it only requires that Forest Supervisor to have the data that is "appropriate" for the decision. Subsection (d) neither authorizes nor requires a District Court Judge to require the Forest Service to have any particular type or quantum of data before approving a timber sale.

Significantly, the initial draft of Section 219.12 provided that the Forest Service should inventory "existing vegetation or biotic communities and associated fish and wildlife resources." This language was deleted as being "unduly burdensome on the agency." Wilkinson & Anderson, pp. 304–305, note 1623. The regulation proposed by the Committee of Scientists required the Forest Service to obtain "quantitative" data as to timber species, range conditions and forage availability. It did not impose a requirement for "quantitative" inventories of fish and wildlife. Final Report of the Committee of Scientists, 44 Fed.Reg. 26650 (May 4, 1979). The regulation now in effect does not require the Forest Service to have quantitative data as to timber or fish and wildlife. As the Defendants point out, the regulation as finally adopted does not even mention the term "sensitive species." Accordingly, the Court rejects the Plaintiffs' argument that 36 C.F.R. § 219.12(d), either alone or in conjunction with other regulations, imposes upon the Forest Service the burden of having quantitative population data and population trend data for all "sensitive species" in the Forest before approving the timber sales at issue in this litigation.

Plaintiffs also contend that 36 C.F.R. 219.19 requires the Forest Service to conduct population inventories and population trend data for sensitive species. The initial paragraph of the regulation states:

Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19. Again, it appears to the Court that this vague and ambiguous prescription was intended to apply to the formulation and monitoring of forest plans rather than site-specific decisions such as approval of a timber sale. "Planning area" is defined as the national forest area covered by a "forest plan." 36 C.F.R. § 219.3. Therefore, maintaining viable populations is a mandate that applies with respect to the Forest as a whole and not to each area affected by a site-specific decision, such as a timber sale. Wilkinson & Anderson, p. 297, note 1587. In any event, the regulation requires the Forest Service to manage "habitat." It does not authorize or require a reviewing Court to impose upon the Forest Service the duty to obtain any particular type or quantum of data before approving a timber sale. As Defendants again point out, the regulation does not even mention "sensitive species." The Court cannot read into the Regulation a requirement to survey particular species of plants and wildlife when such a requirement is plainly not stated in the regulation.

Plaintiffs argue that the necessity for maintaining quantitative data can be inferred from the mandate of maintaining viable populations of existing species. If the necessity of maintaining quantitative data is to be inferred from the objective of "maintaining viable populations," this would require the Forest Service to have this data as to all "existing native and desired non-native vertebrate species in the planning area." For this data to be meaningful in terms of site-specific decisions, the Forest Service would also have to have quantitative population data on all desirable vertebrate species in each individual site. Furthermore, to follow the Plaintiffs' argument to its conclusion, the Forest Service would also have to have quantitative data as to all species at the forest level and at the site-specific level over sufficient chronological intervals to make meaningful judgments as to population trends. The Court is not convinced that the Forest Service meant to impose upon itself such a manifestly onerous burden before it could approve a timber sale.

■ In addition to the general statement set forth above, subsection (a) of Section 219.19 directs the Forest Service to identify certain "management indicator species" to be selected "because their population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1). Subsection (a)(2) then provides: "Planning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species." Subsection (a)(6) states: "Population trends of the management indicator species will be monitored and relationships to habit changes determined." This is one of only two sections of the regulations that refer to population trends. Once again, this regulation does not even refer to "sensitive species." It neither directs nor requires the Forest Service to maintain any particular type or quantum of data regarding "sensitive species." The Court concludes that the intent of the regulation is that population trends of management indicator species must be monitored for the formulation and implementation of forest plans. The regulation does not require population data for sensitive species for approval

of site-specific decisions such as a timber sale. If the Forest Service was required to have population data for all sensitive species, there would be no need to use the management indicator species concept at all.

Counsel for Plaintiffs submitted a letter brief following oral argument on the pending motions. In it, counsel suggested that the Forest Service could and should engage in "periodic quantitative surveys, with sampling and statistical analysis" for the management indicator species and sensitive species. The Court agrees that such surveys would provide useful information and should be performed in an ideal world. However, the issue is not what is desirable in an ideal world, but what is required by the applicable statute and regulations. The issue to be decided is whether the Forest Service acted arbitrarily and capriciously in approving the seven timber sales without performing such surveys as to the many sensitive species in the Chattahoochee National Forest and the 20 management indicator species. There is no basis in the statute or the regulations for reaching such a conclusion. In the real world, the Forest Service may properly take the position that its limited resources may be better spent than performing the type of surveys suggested by Plaintiffs. For example, the Forest Service might decide that it should spend its resources on land acquisition or on erosion and sediment control measures on the old logging roads affecting the West Fork of the Chattooga River rather than on quantitative surveys with sampling and statistical analyses that will withstand the most demanding methodological critique.

■ Plaintiffs also rely upon 36 C.F.R. § 219.26 to argue that the Forest Service must collect inventory data that includes past and present quantitative data regarding sensitive species. The regulation states:

Forest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objectives of the planning area. Such diversity shall be considered throughout the planning process. Inventories shall include quantitative data making possible the evaluation of diversity in terms of

its prior and present condition. For each planning alternative, the interdisciplinary team shall consider how diversity will be affected by various mixes of resource outputs and uses, including proposed management practices.

36 C.F.R. § 219.26. The regulation makes no mention of "sensitive species" at all. Once again, it appears to the Court that this is a regulation intended to govern the process of formulating forest plans rather than making site-specific decisions such as timber sales. Once again, if the requirement for quantitative population data is to be inferred from the goal of advancing "diversity of plant and animal communities," the Forest Service would have to obtain such data for all plant and animal species in the Forest. For such data to be meaningful for site-specific decisions such as a timber sale, the Forest Service would also have to obtain this data for every species for every area that might be subject to a timber sale and it would have to have the data at sufficient chronological intervals to compare present and prior conditions.

This regulation is another example of poor draftsmanship. It is a textbook example of the mischief that arises when a concept that is useful in one context gets applied in a broader context. The concept of "diversity" entered into the debate over National Forest management in terms of maintaining a diversity of forest tree species. One of the concerns that led to enactment of the National Forest Management Act was the concern that Forest Service approved clear cutting of the National Forests would turn them into uniform "pine tree farms." Wilkinson & Anderson, p. 294. One goal of the Act was to mandate preservation of a diverse forest that would include harvestable pine trees as well as the old growth hardwoods that take decades to replace. The discussion of the diversity regulation in the Report of the Committee of Scientists focused almost exclusively upon this issue of conversion of timber stands from one type of the species to another. Final Report of the Committee of Scientists, 44 Fed.Reg. 26608-9 (May 4, 1979).

Maintaining quantitative data as to the diversity of tree species is both feasible and useful. Trees can be counted. They do not hide in burrows during daylight hours or, like the spotted salamander, appear above ground to mate only a few days of the year. Trees do not wander about the forest. Meaningful quantitative surveys can be made of the number of oak trees in the Forest versus the number of loblolly pine trees in the forest in 1990 versus 1980. With respect to wildlife, it appears to the Court that diversity measured in terms of available habitat is the objective of the Act and of 36 C.F.R. § 219.26. Therefore, the Court is compelled to reject the Plaintiffs' argument that this regulation imposes a mandate upon the Forest Service to have quantitative population data and population trend analysis for all sensitive species in the Forest before it can approve timber sales such as those at issue in this litigation.

■ In addition to the regulations, the Plaintiffs also rely upon certain provisions in the *Forest Service Manual*. The manual provides that the Forest Service will develop and implement management practices to insure that species do not become threatened or endangered because of Forest Service actions. *Forest Service Manual* § 2670.2(1). It will maintain viable populations of "all native and desired non-native wildlife, fish and plant species in habitats distributed throughout their geographic range on national forest system lands." *Forest Service Manual* § 2670.2(2). It will also develop and implement management objectives for "populations and/or habitat of sensitive species." *Forest Service Manual* § 2670.2(3). It will, as part of the National Environmental Policy Act process, review programs and activities "through a biological evaluation, to determine their potential effect on sensitive species." *Forest Service Manual* § 2670.3(2). It will avoid or minimize impacts to species whose viability has been identified as a concern. *Forest Service Manual* § 2670.3(3). It will "[i]dentify, manage, and protect essential and critical habitats to meet legal requirements and recovery objectives for Federally listed species; identify, protect and manage habitat necessary to meet sensitive species objectives." *Forest Service Manual* § 2670.46(2).

The manual provides specific guidance as to the process and content of a biological evaluation to be performed as a part of the National Environmental Policy Act process. It must be performed by a biologist or a botanist. *Forest Service Manual* § 2672.42. The biological evaluation must identify all Endangered Species Act listed, proposed and Forest Service identified sensitive species (the "PETS" species) known or expected to be in the project area or that the project potentially affects. *Forest Service Manual* § 2672.42(1). It must identify and describe all occupied and unoccupied habitat recognized as essential for "listed or proposed species recovery, or to meet Forest Service objectives for sensitive species." *Forest Service Manual* § 2672.42(2). It must contain "[a]n analysis of the effects of the proposed action on species or their occupied habitat or on any unoccupied habitat required for recovery." *Forest Service Manual* § 2672.42(3). Nothing in the excerpts from the *Forest Service Manual* submitted to the Court impose upon the Forest Service the duty to have and maintain the sort of quantitative population data and population trend analysis data that Plaintiffs demand before approval of site-specific decisions such as timber sales.

A final observation applies to all of the regulations discussed above. If the regulations apply to site-specific decisions, they are so vague and general that they create no judicially enforceable standard for the Court to determine when the agency has sufficient data and when it has insufficient data. If the Court remanded this case to the agency based upon Plaintiffs' interpretation of the regulations, it could only order it to collect *more* data without articulating how much *more* is enough. If the Court remanded this case to the agency, it would, in effect, take over the management of the Chattahoochee National Forest with respect to timber sales. That is not the role of a reviewing Court under the Administrative Procedure Act.

This analysis of the National Forest Management Act and the regulations is generally consistent with the developing case law in this area. An important case is the recent decision of the Ninth Circuit in *Inland Em-*

*pire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754 (9th Cir.1996). In that case, the plaintiffs alleged that the Forest Service failed to comply with 36 C.F.R. § 219.19 in approving eight timber sales. The court did hold that the regulation applied to site-specific projects such as timber sales. As in this case, the plaintiffs claimed that the Forest Service was required to have population data, including population trend data, for the sensitive species living in each project area. The Ninth Circuit rejected this claim, and held that the Forest Service can comply with § 219.19 by maintaining sufficient habitat to assure viability of each species. The court held that the Forest Service is entitled to rely upon reasonable assumptions in its environmental analyses. The court noted that for the smaller, more reclusive species such as the pileated woodpecker, there is no technically reliable and cost-effective method of counting individual members of the species. Accordingly, the court upheld the use of the management indicator species concept in terms of assessing indirect and cumulative effects of Forest Service action.

Claims similar to those made by the Plaintiff in this case were also rejected in *Krichbaum v. Kelley,* 844 F.Supp. 1107 (W.D.Va. 1994), *aff'd* 61 F.3d 900, 1995 WL 449668 (4th Cir.1995). The court there rejected the argument that 36 C.F.R. §§ 219.12 and 219.26 required the Forest Service to have detailed lists of the plants and animals in each area of a timber sale. The court also upheld the use of the management indicator species list as a proxy for other plant and animal species. The court observed that the "diversity" requirement of the regulation was so vaguely defined that "the court is hard-pressed to find in it any substantive command to consider any particular creature." *Id.,* 844 F.Supp at 1114. The court then concluded that the process employed by the Forest Service (virtually identical to what was done here) was not arbitrary and capricious, and granted judgment in favor of the defendants. *See also Sharps v. U.S. Forest Service,* 823 F.Supp. 668, 679 (D.S.D.1993), *aff'd* 28 F.3d 851 (8th Cir.1994); *Seattle Audubon Soc. v. Moseley,* 80 F.3d 1401, 1404 (1996); *Environment Now! v. Espy,* 877 F.Supp. 1397, 1422 (E.D.Cal.1994).

Plaintiffs also rely upon the National Environmental Policy Act. They contend that the Forest Service acted arbitrarily and capriciously and unlawfully in performing the Environmental Assessments for the subject timber project without having the quantitative data that Plaintiffs say must be considered in making a site-specific decision under the National Forest Management Act and the Forest Plan for the Chattahoochee National Forest. Pursuant to the National Environmental Policy Act, a federal agency must prepare an environmental impact statement for any major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In order to determine whether the environmental impact statement should be prepared, the agency may first prepare an "environmental assessment." 40 C.F.R. §§ 1501.3. This environmental assessment has been described as a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement ... is necessary." *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir.1990). *See also* 40 C.F.R. § 1508.9. An Environmental Assessment is expected to be brief and concise. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546 (11th Cir.1996); *Sierra Club v. U.S. Forest Service*, 46 F.3d 835, 840 (8th Cir.1995). Once an environmental impact statement has been approved for a project, the project can be carried out without the agency having to issue a new statement for every stage of the project. *Cronin*, 919 F.2d at 447.

The National Environmental Policy Act does not dictate substantive outcomes. It requires that federal agency decisions significantly affecting the environment be made on the basis of relevant information, and that the adverse environmental effects of agency action are adequately identified and evaluated. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). The Act requires the agency to take a "hard look" at its decision, but does not require environmental considerations to prevail over all other considerations. *Swanson v. U.S. Forest Service*, 87 F.3d 339, 343 (9th Cir.1996). The Act does not "specify the quantum of information that must be in the hands of the decision maker." *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C.Cir.1978). *See also Druid Hills Civic Assoc. v. Federal Highway Administration*, 772 F.2d 700, 708–709 (11th Cir.1985). If the agency determines that an environmental impact statement is not required, that decision is formally made in a "finding of no significant impact." 40 C.F.R. § 1508.13. As to each of the seven timber projects at issue here, the Forest Service made a Finding of No Significant Impact and approved the projects.

## IV. STANDARD OF REVIEW

Judicial review of federal agency action is governed by the Administrative Procedure Act, 5 U.S.C. § 706. The Act provides that in reviewing agency action, the reviewing court shall set aside agency action found to be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law..." *Id.* The reviewing court must make a substantial inquiry into the factors considered by the agency, but it must not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Druid Hills Civic Assoc., Inc.*, 772 F.2d at 714. Agency decisions are entitled to a presumption of regularity. Agency action can be overturned only where there has been a "clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. Agency action is presumed to be valid. *Manasota–88, Inc. v. Thomas*, 799 F.2d 687, 691 (11th Cir.1986). The Court must defer to the Forest Service's construction of the statute it administers, unless the plain statutory meaning is to the contrary. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). An agency's interpretation of its own regulations is controlling where the interpretation is not "plainly erroneous or inconsistent with the regulation." *Robertson*, 490 U.S. at 359. The party challenging the agency action has the burden of proof on all issues. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995). A reviewing court must be most deferential where the issue concerns scientific

determinations or technical matters within the expertise of the agency. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). When experts express conflicting views, the agency has the discretion to rely on the reasonable opinions of its own experts. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). This is true even if the court might find contrary views more persuasive. *Id.*

In general, judicial review of agency action is limited to review of the administrative record. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (validity of an agency's action must "stand or fall" on the administrative record). There are important reasons behind the rule limiting judicial review to the Administrative Record.

> Confining the district court to the record compiled by the administrative agency rests on practical considerations that deserve respect. Administrative agencies deal with technical questions, and it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency. Trees may seem far removed from the arcana of administrative determination, but one has only to glance at the documents submitted in this case to realize that "silviculture" is in fact a technical field, and not just one with a dry and forbidding vocabulary.

*Cronin,* 919 F.2d at 444. However, this rule is not without exceptions. The court may review additional materials to determine the basis of the agency's action and the factors considered by it. *Friends of the Earth v. Hintz,* 800 F.2d 822, 829 (9th Cir.1986). Furthermore, it has been recognized that:

> It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not. The court cannot adequately discharge its duty to engage in a "substantial inquiry" if it is required to take the agency's word that it considered all relevant matters.

*Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1160 (9th Cir. 1980). *See also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers,* 87 F.3d 1242, 1246 (11th Cir. 1996). The court may consider expert testimony if it is necessary to understand the issues and to determine whether the agency acted in conformity with a governing statute. *Love v. Thomas,* 838 F.2d 1059, 1067 (9th Cir.1988). Numerous affidavits have been submitted by the parties and depositions have been taken of some of the Forest Service biologists who performed the biological evaluations for the seven timber cutting projects. This Court has considered the affidavits and depositions in a manner consistent with these principles. In the final analysis, however, it is the Administrative Record that is controlling.

This case is before the Court on a motion for summary judgment by the Plaintiffs and cross-motions for summary judgment by the Defendants and the Intervenors. Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties show that there is no genuine issue of material fact and that the Movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The evidence and any inferences that may be drawn should be viewed in the light most favorable to the non-movant. *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). The party seeking summary judgment must first identify grounds that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Mere denials or allegations by the non-movant in the form of legal conclusions unsupported by any specific facts have no probative value, and are therefore insufficient to create issues of material fact that would preclude summary judgment. *Broadway v. City of Montgomery,* 530 F.2d 657, 660 (5th Cir.1976).

## V. FOREST SERVICE REVIEW OF THE TIMBER SALES

■ In 1985, the Forest Service adopted the current Land and Resources Plan for the Chattahoochee and Oconee National Forests. Prior to the adoption of the Plan, timber harvesting in the Chattahoochee National Forest had been almost 100 percent clear cutting. One objective of the proposed Plan was to reduce the use of clear cutting by using shelterwood and group selection cutting techniques, especially on sensitive management areas. At the time the Plan was adopted, 64 percent of the Chattahoochee National Forest was hardwood trees. The Plan contemplated a reduction of this to 60 percent. The Plan proposed to increase ownership of land within the Forest boundaries by 91,983 acres over several decades. The Plan provided for approximately 13,700 acres of timber to be cut annually during the first decade of the Plan. Of this, 3500 acres would be cut using clear cutting as the harvest method. The Plan was challenged in *Wilderness Soc. v. Alcock,* 867 F.Supp. 1026 (N.D.Ga.1994). The District Court held that the plaintiffs had no standing to challenge the Plan and the challenge was not ripe for review until the Forest Service implemented the Plan by making site-specific decisions. The Court of Appeals for the Eleventh Circuit affirmed, holding that the challenge to the Plan was not ripe for review. *Wilderness Soc. v. Alcock,* 83 F.3d 386 (11th Cir.).

The Forest Plan assigns areas within the Chattahoochee National Forest to one of 17 different Management Areas. Each type of management area is managed to emphasize different values and uses of the forest. For example, considerable acreage is devoted to wilderness areas (Management Area 1), rugged old growth areas (Management Area 4), old growth areas (Management Area 17), a buffer zone around the Appalachian Trail (Management Area 5), scenic areas and recreational areas (Management Areas 7, 8, 9 and 15), natural areas (Management Areas 10 and 13), and buffer zones around recreational waterways (Management Area 11). Timber harvesting is not allowed or is significantly reduced in these areas.

The Forest Plan also allocates a portion of the Chattahoochee National Forest to a "working forest" where timber production is authorized (Management Area 16). The Plan does not mandate timber harvesting in any particular compartment of the Management Area. That decision is made by the District Ranger or Forest Supervisor. The timber cutting projects at issue in this litigation are in the "working forest" areas, i.e. in Management Area 16. Timber harvesting in these areas should occur in an environmentally responsible manner. The Forest Plan imposes numerous environmental constraints upon timber harvesting to protect water quality and wildlife. These include complying with the "Best Management Practices" adopted by Georgia pursuant to the Clean Water Act, employing erosion control measures on roads, replanting cut areas to render erosion a temporary phenomena, and replanting cut areas with numerous tree species to create biological diversity. Additional environmental constraints and mitigation measures were imposed by the Forest Service for some of the timber cutting projects involved in this litigation.

The Plan did not require the Forest Service to have quantitative population data and population trend data for all sensitive species before making site-specific decisions such as timber sales. Therefore, Plaintiffs' claims probably should be viewed as an attack upon the Forest Plan itself. The Administrative Record for the 1985 Plan is not before the Court. At oral argument on the pending motions, the Court expressed its concern about reviewing the 1985 Plan on the basis of a response by the Forest Service to a Freedom of Information Act request rather than the Administrative Record upon which the

Forest Service based its approval of the 1985 plan. In response, counsel for Plaintiffs stated that they were not challenging the 1985 Land and Resources Plan itself and that they were only challenging the Plan "as implemented" by the seven timber sale projects. The burden is upon the plaintiffs in an Administrative Procedure Act case such as this to establish that the agency action was unlawful, arbitrary and capricious or an abuse of discretion. The Court concludes that the Plaintiffs have failed to carry that burden to the extent that their claims are construed as challenges to the 1985 Plan itself. Therefore, the Court will consider only the issue of whether implementation of the Plan by these seven timber sales was arbitrary and capricious.

The Forest Plan provided that there would be no increase in sedimentation effects in the first decade of the Plan as compared to sedimentation effects produced by previous management. This did not mean that the management activities contemplated by the Plan would have no effect upon soil and water resources in the Chattahoochee National Forest. The Plan contemplated new road construction of 50 miles of permanent roads and 150 miles of intermittent service roads. The Forest Service estimated that the activities contemplated by the Plan would result in the deposit of 35,000 tons of sediment per year. Logging activities are not the only sources of sedimentation, or even the primary source of sedimentation. It should be noted that the alternative plan with minimal damage to the environment due to logging would still result in 29,500 tons of sediment. The Final Environmental Impact Statement described in detail the unavoidable environmental consequences of each alternative, including sedimentation effects due to logging and road construction and temporary changes in scenic values due to logging.

The 1985 Forest Plan included extensive provisions for implementing the Plan and monitoring its implementation. With respect to plants, wildlife and fish, the Plan provided that the Forest Service would monitor management indicator species and their habitat. The whitetail deer, black bear, turkey, grouse, quail, gray squirrel, bog turtle, yellow ladyslipper, mountain pitcher, brook trout, brown trout, rainbow trout, red-eye bass, turquoise darter, yellow fin shiner, Coosa darter, pileated woodpecker and indigo bunting were identified as the management indicator species. As to each species, the Plan set forth the specific monitoring techniques and data sources that were to be relied upon. This varied with respect to each species. For example, population densities of deer in Wildlife Management Areas was to be determined by the State Department of Natural Resources through analysis of kill data and herd modeling. Bear populations were to be monitored using scent station visitation rates on Wildlife Management Areas. Squirrel populations were to be monitored by reviewing acres of upland and cove hardwood 50 years and older that are suitable habitat. Bog turtle populations were to be surveyed through capture and marking. Fish populations were to be surveyed using electro-fishing surveys and biomass estimates. Birds were to be monitored with songbird censuses. The Plaintiffs challenge the Plan only "as implemented." Therefore, they cannot now claim that the Forest Service chose inadequate means of surveying populations and population trends for the management indicator species.

After the adoption of the 1985 Forest Plan, the Forest Service on an annual basis published monitoring reports. The monitoring reports all state that the Forest Service was in compliance with the monitoring requirements regarding management indicator species. Every other year, on average, the monitoring reports contained detailed discussions of population trends for the management indicator species. For example, the 1989 monitoring report states that deer populations ranged from 15 to 20 deer per square mile in the mountains and 45 to 60 deer per square mile in the piedmont. It stated that black bear populations in the mountains have been increasing at a rate of ten percent per year for the past decade. It estimated a current population of 600 to 700 bears. Annual losses to legal hunting over the past five years averaged 30 per year. Wild turkey populations were noted to be abundant and increasing in that recent droughts had improved reproduction. The

population of grouse was noted to be fairly stable, although there was some evidence of a cyclic decrease in 1988. Populations of quail were low in the mountains where quail habitat is marginal and where the species is replaced by the ruffled grouse. In the piedmont, populations of quail were noted to be depressed in part due to habitat impacts from an overabundance of deer. The report noted that surveys for bog turtles are conducted annually and that one site containing a population had been documented. The report noted that there was an inventory of known sites for yellow ladyslipper although trends for this plant were difficult to ascertain. The report expressed concern over the long term fate of brook trout. It noted that populations were stable in streams without other salmonid species, but that brook trout are displaced whenever rainbow and brown trout are introduced into a stream. The report noted that populations of red-eye bass, turquoise darter, yellow-fin shiner and Coosa darter appeared to be stable based upon sample data. In addition to the annual monitoring reports, the Forest Service prepared a five year review of the Forest Plan. This five year review included extensive discussion of population trends for the management indicator species. The pertinent section of the monitoring report for 1994 is attached as Appendix A to this Order in order to demonstrate the plant and wildlife population data available to the Forest Service at the time these timber cutting projects were being approved. The Court finds that the Forest Service has complied with the Forest Plan with respect to monitoring population trends of the management indicator species.

The 1985 Land and Resources Management Plan contained a Final Environmental Impact Statement. It contained a detailed analysis of the effects upon the environment of the management activities proposed for each Management Area, including the timber harvesting activities in Management Area 16. It contained a detailed analysis of the effect of the Plan upon habitat for the management indicator species. The Final Environmental Impact Statement does not require the Forest Service to have quantitative population data and trend analysis data for all sensitive species in order to approve specific timber sales. In 1989, the Forest Plan was amended by the adoption of the "Final Environmental Impact Statement Vegetation Management–Appalachian Mountains." It is apparent to the Court that the Final Environmental Impact Statement Vegetation Management–Appalachian Mountains document was intended to describe "vegetation management." It provides that projects must have site-specific analysis in compliance with the National Environmental Policy Act. It provides in part:

A biological evaluation of how a project may affect any species Federally listed as threatened, endangered, or proposed, or identified by the Forest Service as sensitive, is done as part of the site-specific environmental analysis. This evaluation considers all available inventories of threatened, endangered, proposed, and sensitive species populations and their habitat for the proposed treatment area. When adequate population inventory information is unavailable, it must be collected when the site has high potential for occupancy by a threatened, endangered, proposed or sensitive species.

It goes on to state that state wildlife agencies will be consulted if a project will have an adverse effect on a "sensitive species or its habitat." Finally, it provides that water quality is to be protected through use of preventive "Best Management Practices."

In addition to their claim that the Forest Service violated its own regulations, Plaintiffs also argue that the Final Environmental Impact Statement Vegetation Management–Appalachian Mountains portion of the Forest Plan required the Forest Service to obtain quantitative data on sensitive species before approving the timber sales at issue. However, the plain language of the Statement requires the Forest Service to perform inventories only when the available information is inadequate. Whether the available information is inadequate must generally be determined by the Forest Service. After review of the Administrative Record, the Court has no basis for concluding that the Forest Service acted arbitrarily and capriciously in relying upon the information available to it in approving the timber sales.

In approving the seven timber cutting projects, the Forest Service in each instance performed a biological evaluation as required by the Final Environmental Impact Statement Vegetation Management–Appalachian Mountains. The Forest Service Biologist reviewed data from the Georgia Freshwater Wetland and Heritage Inventory to determine if there were known locations of animal or plant PETS species in the timber project area. A botanist completed a thorough survey of each stand of timber to be cut for the presence of any PETS plant species. The objective of these surveys was to provide a quantitative inventory of PETS plant species in the stands of timber to be cut. Any PETS plant species were identified and generally were counted. Populations of sensitive plants were flagged and protected from timber harvesting activities. Topographic features and descriptions of the overstory, midstory and understory vegetation were also recorded. A Forest Service biologist evaluated possible impacts upon sensitive plant and animal species for which there was suitable habitat in the timber project area. In some instances, streams were surveyed for brook trout or other aquatic wildlife. A biological evaluation was then prepared in compliance with the Endangered Species Act, 16 U.S.C. § 1536 and the Final Environmental Impact Statement for the 1985 Forest Plan. In each instance, the biological evaluation concluded that the project might affect individual PETS species, but that it would not likely result in the listing of any species under the Endangered Species Act or a loss of viability of any species in the Forest. Each of the biological evaluations were prepared in accordance with the directives in the Forest Service Manual.

The findings of no significant impact as to sensitive species were based upon individual analyses of the effect upon each species. For example, at the time of the Big Net biological evaluation, the small whorled pogonia was classified as an endangered species. All populations of this plant in the Chattahoochee National Forest are protected. None of the plants were found in the stands of timber to be cut in the Big Net project. Small whorled pogonia occur both in fairly young (as young as 30 years of age) stands of trees and in mature forests. The Chattahoochee National Forest contains at least 650,-000 acres of suitable forest type for this plant. Given the abundance of potential habitat in the forest for this plant, the Forest Service biologist reached the conclusion that the proposed Big Net project would not affect the viability of the small whorled pogonia in the Forest. It is difficult to argue with this conclusion when none of the plants were even found in the project area.

Similar analysis was performed with respect to other species such as the northern pine snake. Its preferred habit is dry, sandy, forest areas, dominated by Virginia pine and mixed pine-hardwood forests. There have been only limited reports of sightings of this snake in Georgia, but it is thought to exist throughout the Blue Ridge region. It is very secretive and spends the majority of its time underground. The Forest Service Biologist determined that the northern pine snake could be present in the Big Net project area. One seven acre stand of white pine could provide marginal habitat for the snake. However, there are approximately 150,000 acres of dry pine and pine-hardwood habitat in the Chattahoochee National Forest. Therefore, the biologist concluded that the Big Net project did not pose a significant threat to viability of this species in the Forest. This Court has no basis for finding that decisions such as these are irrational, arbitrary or capricious or an abuse of discretion.

The Forest Service then assembled a group of specialists in forestry, biology, botany, hydrology and soil to formulate options and to prepare an Environmental Assessment. This team reviewed geological and topographical maps of the proposed sites and information on the types and distribution of forest, age class distribution of trees and past timber harvest activities. The interdisciplinary team reviewed each proposed project for impacts on management indicator species. Each Environmental Assessment identified the management indicator species affected by the project, the basic habitat needed by each species and the objective with respect to providing that habitat. The effects of each alternative upon the manage-

ment indicator species were compared. A preferred alternative was identified for each project. Each Environmental Assessment prepared after this review discussed in depth the possible impacts of each alternative action on various resources such as soil, water, wildlife and recreation. Each Environmental Assessment relied upon the Forest Service's Computerized Project Analysis of Timber Sales ("COMPPATS") for estimates for the supply of key habitat needs for certain wildlife species, soil erosion estimates and estimates of costs and returns. The individual projects (although not always the alternative proposed in the Environmental Assessment) were then approved by the District Ranger upon his finding that there were no significant impacts to the environment. The Forest Service did not find, and was not required to find, that the seven timber projects would have no impact on the environment. Indeed, the impact of the projects upon the environment are well documented in the Administrative Record and certainly warranted preliminary relief until a final determination could be made with the benefit of a full Record, thorough briefing of the issues and oral argument.

The effects of the proposed timber projects upon soil and water resources were analyzed at length in each of the Environmental Assessments. In the Compartment 05 project, for example, the Forest Service noted that the actions in the project area which have the greatest impact on water quality are road construction, private land development, run-off from exposed agricultural lands, and point source pollution. It noted that the upper headwaters of Big Creek flow through private land consisting of fields, forested lands, homes and roads. With regard to the proposed logging activity, the Forest Service concluded that increased sedimentation would be temporary due to road work and that the effects were not unacceptable. The Forest Service noted that the effects of increased sediment might be noticeable on some of the small tributaries of the Chattooga River. However, these effects would be temporary. Due to the massive dilution from a watershed the size of the Chattooga River (250 square miles), the effects of temporary sedimentation in the tributaries would be

temporary and slight to immeasurable in the larger streams. In the Compartment 59 project Environmental Assessment, the Forest Service concluded that the COMPPATS sedimentation yield was probably too high for several reasons. It did not take into account the closing of one-half mile of existing road. The one mile of temporary road construction would occur on old existing road beds and would create less potential for sediment that new excavation. Temporary road construction with spot graveling would improve drainage on the existing roads in this project area.

After careful review of the Administrative Record, the Court concludes that the effects of the timber sales upon soil and water resources were adequately analyzed and evaluated by the Forest Service. The effects upon soil and water resources are of the character and magnitude anticipated by the Forest Plan and its Final Environmental Impact Statement. The Court is compelled to conclude that the Forest Service may have been wrong, but it did not act arbitrarily and capriciously or abuse its discretion in its evaluation of the effects of the timber sales upon soil and water resources in the Chattahoochee National Forest.

Plaintiffs have submitted a second affidavit of Dr. Haney in response to the materials submitted by the federal Defendants in support of their motion for summary judgment. In his affidavit, he takes issue with the methodology employed by the Forest Service biologists. In order to present a valid scientific methodology, Dr. Haney says that the Forest Service was required to base its decision upon "measured data" that can be replicated or repeated in order to arrive at a similar or opposite conclusion. He also concludes that the use of "potential habitat or habitat capability for a sensitive species alone as a measure of population viability is without scientific merit." Finally, he states that the Forest Service must make management decisions based upon whether a species' population trend shows an increase or decrease in numbers. Presumably these numbers would have to be available as to each sensitive species for each tract of land in the Forest and for the Forest as a whole.

It is clear that the Environmental Assessments and the Findings of no Significant Impact were not based upon population surveys of wildlife in the project areas. The Forest Service takes the position that such surveys cannot usually be done and would not provide meaningful data. For example, the Environmental Assessments for these projects generally contained this or a similar statement:

> Monitoring of wildlife numbers (population) cannot usually be done at the level of a compartment. Instead, they are monitored with broader data about trends and habitat conditions. Georgia Department of Natural Resources, Game and Fish Division records from managed hunts, bear survey routes, hard mast crop estimates, and nuisance bear reports all help define trends. Trend data over the last several years indicate a steady increase in the number of bears and wild turkey for instance. Breeding bird surveys done by the Forest Service for the past five years monitor habitat use trends for neotropical migrant birds. Winter bird counts by volunteers from the Audubon Society are conducted on some Districts. Biological evaluations are building a strong data set about plant and animal species of special concern. Fish habitat inventories and fish population surveys are available for many of the streams in the forest. They were originally done in the 1960s and are being updated.

Dr. Haney may disagree with this approach to the assessment of Forest Service actions upon sensitive plants and wildlife. However, the Court cannot conclude that the methodology of the Forest Service in assessing population trends is so irrational as to be arbitrary and capricious or an abuse of discretion.

At its best, forest planning is an inexact science. Wilkins & Anderson, p. 11. The Administrative Procedure Act does not permit this Court to overturn agency action because of a dispute between the Plaintiffs' expert and the Forest Service biologists as to the proper scientific methodology to employ in making management decisions affecting the Chattahoochee National Forest. *See Si-erra Club v. Robertson,* 784 F.Supp. 593, 608 (W.D.Ark.1991), *aff'd* 28 F.3d 753 (8th Cir. 1994); *Sierra Club v. Marita,* 46 F.3d at 620–621 (Forest Service is entitled to use its own methodology unless it is irrational). Dr. Haney may or may not be the better scientist. His criticisms of the Forest Service surveys may well be valid. However, he has not convinced this Court that the methodology employed by the Forest Service is so irrational that the Court is required to set aside the agency action under the very deferential standard of review authorized by the Administrative Procedure Act. Neither the National Forest Management Act, nor the implementing regulations, nor the Forest Plan require the Forest Service to have the type of scientific data identified by Dr. Haney before it may makes management decisions affecting the Chattahoochee National Forest. After careful review of the Administrative Record for the seven timber cutting projects, the Court is compelled to conclude that the Forest Service did not act arbitrarily or capriciously, and did act in conformity with its own regulations and the statutory mandate that timber production is one of the appropriate uses of the National Forests.

In this case, Plaintiffs have a fundamental disagreement with the Forest Service as to the impact of timber sales on various plant and animal species and the environment. The Court shares their concern that the natural beauty and diversity of wildlife in the North Georgia mountains should not be sacrificed to sell a few truckloads of timber. However, disagreement with the decision to approve these timber cutting projects does not mean that the Forest Service did not make a reasoned evaluation of the possible impact of the timber sales on the environment and on sensitive plants and wildlife. The Multiple–Use Sustained–Yield Act and the National Forest Management Act allow the Forest Service to make decisions that will damage the environment in the National Forests.

■ The National Forest System was created in part "to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475. The Multiple–Use Sustained–Yield

Act of 1960 provided that it was the "policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. Congress contemplated that the National Forests would be managed for "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b). The National Forest Management Act retained the Multiple–Use and Sustained–Yield mandate for National Forests. 16 U.S.C. § 1604(e)(1). The Act specifically authorizes timber harvesting where there may be temporary and reversible damage to soil, slope, or other watershed conditions. 16 U.S.C. § 1604(3)(e)(i). The Act "contemplates that timber harvesting may be carried out even though such harvesting may cause temporary or short term damage to soil and watershed conditions." *Citizens for Environmental Quality v. U.S.*, 731 F.Supp. 970, 984 (D.Colo.1989).

Pursuant to this Congressional mandate, the "national forests, unlike the national parks, are not wholly dedicated to recreational and environmental values." *Cronin,* 919 F.2d at 448. The National Forests will not be maintained as a "pristine environment" as long as they are subject to multiple uses as directed by Congress, including timber harvesting and even clear-cutting. *Sierra Club v. Espy,* 38 F.3d 792, 800 (5th Cir.1994). The timber sales at issue here will certainly have adverse effects upon the Plaintiffs' aesthetic, recreational and environmental interests in the Chattahoochee National Forest. However, Congress has made the policy decision to permit timber cutting, including clear cutting, in the National Forests. The Forest Service made the policy decision to approve the Forest Plan allowing timber cutting in the areas of these seven projects. Until those policy decisions of the Legislative Branch and the Executive Branch are reversed, timber cutting may continue, notwithstanding the harm it causes to the unique environment of the Chattahoochee National Forest.

## CONCLUSION

For the reasons set forth above, the Court DENIES the motion for summary judgment of the Plaintiffs [Doc. No. 54] and GRANTS the cross-motions for summary judgments of the Defendants and Intervenors [Doc Nos. 62 and 63]. The Court's Order of September 17, 1996, issuing a temporary injunction is vacated and the Clerk is directed to enter judgment in favor of the Defendants and Intervenors and against the Plaintiffs. The Plaintiffs' Motion for Leave to File Supplemental Brief [Doc. No. 84] is DENIED.

## APPENDIX A

### FINAL—FY 94 M & R REPORT

*C3*

*Management Indicator Species (MIS) and their Habitat*—assure maintenance of plant and animal species diversity and viable populations of all existing vertebrate species.

The Forest selected 20 Management Indicator species to be used forest-wide, but additional Project Management Indicator Species are added in local situations. The implementation process requires the selection of all Forest-wide MIS which geographically occur in project areas to be named as Project MIS. This procedure assures that special habitat considerations be taken into account in meeting viability objectives.

A brief status of each of the Forest MIS is presented below:

White-tailed Deer—Deer densities have been estimated to range from 15–21 deer per square mile in the mountains and 33–46 deer per square mile in the piedmont (Kent Kammermeyer, Sr. WL Biologist, GA DNR). The populations in the mountains are limited due to marginal habitats and poor soil fertility. Early-succession habitats and areas of hard mast producing trees are necessary to raise the mountain densities above the 15–20 range.

The piedmont populations, however, have been at or above carrying capacity in many places. The Georgia Game and Fish Commission has recognized this problem and liberalized harvest limits to reduce the deer

densities. Thee liberalization of the Deer harvest appears to be having some effect. Deer densities for the Cedar Creek and Redlands WMA's (Oconee NF) were estimated at 46 deer per square mile in 1992, 39.5 deer per square mile in 1993, and 33.5 in 1994.

Black Bear—The Black Bear population has continued to increase in the Mountains with an estimated population of 850–900 individuals. Forest personnel are participating in the biennial Bait Station Survey to monitor trends in bear population. Information from this survey indicates that the population is still expanding and filling un-occupied parts of historic range. David Carlock, Sr. Wildlife Biologist with the Georgia DNR Game Division, reports slight increases over the last 3 years with bears moving into areas with higher human populations (pers.comm.).

Eastern Wild Turkey—Turkey populations across the Forest have remained moderate to high and relatively stable over the last 3 to 4 years (David Carlock, pers. comm.). Some fluctuations have been noted, probably due to fluctuations in weather and mast production.

Ruffed Grouse—Grouse numbers continue to decline based on feedback from hunters and the ruffed grouse drumming surveys conducted in Georgia by the Georgia DNR Game Division. Males heard drumming per 100 hectares have declined in the DNR survey according to the following table:

Male Ruffed Grouse Detected per 100 Hectares

| YEAR | 1990 | 1991 | 1992 | 1993 | 1994 |
|------|------|------|------|------|------|
| # | 1.1 | 1.1 | 0.8 | 0.7 | 0.6 |

It is difficult to determine whether this decline is attributable to the natural cycle in grouse populations or some other mechanism. However, evidence is mounting that loss of early successional habitat may be contributing to declining grouse numbers. This phenomenon should be thoroughly examined during the Forest LRMP revision.

Bobwhite Quail—Bobwhite Quail populations have been declining throughout the southeastern U.S. for the past 15 years with as yet no conclusive explanation. The same region-wide decline is evident on the Forest. Quail populations on the Chattahoochee are expectedly low due to the marginal quail habitat of the mountains. The Oconee continues to experience a gradual decline. The high density of deer on the Oconee may be a contributing factor, or even a significant factor, in the decline of quail due to competition for legumes and other shared food sources. The expected reduction in the deer herd due to liberalized harvest regulations may eventually be effective in the recovery of quail populations.

Gray Squirrel—This species continues to do well across the Forest wherever hard mast and dens are available. The supply for hunting far exceeds demand and population viability is not in question.

Bog Turtle—The one documented site on the Forest was surveyed through trapping in FY91 and FY92. Only 2 individuals were found during these surveys. Following the management plan developed for this site, we began an annual habitat improvement project in this site in FY90 which is continuing. This involves selective opening of the canopy to encourage the growth of herbaceous vegetation and the development of shallow, backwater areas. This work has successfully reestablished much of the characteristic bog vegetation on the site. The site will be surveyed for bog turtles this summer to determine if they have responded to the improved habitat. Potential habitat for this species also exists in a number of other locations on the Forest. An effort to identify and survey potential habitat, funded by the Georgia Department of Natural Resources Endangered Species Fund, was initiated in FY91. To date, 3 new bog turtle populations have been identified. All 3 sites are on private land. Suitable National Forest habitat in the vicinity of the private land populations will be surveyed in the summer of 1995.

Yellow Lady Slipper—As a result of plant surveys from 1991—1994, many new sites of yellow lady's slipper have been documented. Approximately 11% of stands surveyed contained the orchid, with numbers of the orchids ranging from one plant to 100+ plants.

Purple Pitcher Plant—This species is at considerable risk due to the fact that it is genetically isolated and produces seed only at infrequent intervals. The species occurs in only one known site in the Forest, and has

been closely monitored since 1981. Each winter during 1992–1994, the Atlanta Botanical Gardens (ABG), in cooperation with the Georgia State Heritage Program, transplanted 30–40 plants they previously propagated from rhizomes of this population. Release of the pitcher plants has been accomplished by periodically hand-clearing encroaching rhododendron and red maple. The site contains 4 subpopulations. One of them is totally natural, another has been augmented, and 2 of them have been established by the ABG.

Small-Whorled Pogonia—Since 1991, 6 new sites of small-whorled pogonia have been found in the Forest, bringing the total number of known sites to 12. The plants are being monitored annually with respect to counts and number of fruiting specimens. Plant numbers at the various sites have shown some fluctuation, with increases on some sites and decreases on others. The USFWS Recovery Plan contains no management recommendations. Data is not available which would provide information on effects of various habitat manipulations on the plants. If a definite downward trend in numbers occurs on any of the sites, it may be beneficial to designate one as an experimental population with the concurrence of USFWS. This would allow habitat manipulation of the site with the objective of increasing the population. At this point in time, it is too early to determine if the sites with decreasing numbers in 1994 are really declining or merely experiencing a fluctuation which is normal for the small whorled pogonia. We will continue to monitor this orchid annually.

Large-Flowered Skullcap—This mint is found on private land adjacent to Forest Service land, but to date surveys have yielded none of this skullcap on FS lands. In 1991, plants were dug from private land scheduled to be bulldozed and were cultivated at the Atlanta Botanical Gardens. They also rooted clippings from these plants to obtain additional plants. In 1992, employees from the U.S. Forest Service, the Nature Conservancy, and the Atlanta Botanical Gardens planted the propagated skullcaps on 2 sites on FS land. Twenty-three individuals were planted on 1 site, and 12 on the other. there was a 100% survival rate of the 23 plants (site 1) as of 1994. There has been a decline from 12 plants, to 9 present in 1993, to 5 remaining in 1994 on the second site. The first site has ample room to establish 100 or more plants to increase the population. The Forest Service will work with the Atlanta Botanical Gardens to accomplish this in 1995 of 1996.

Green Pitcher Plant—In 1988, a transplant site using stock propagated from the natural site on Lake Chatuge was established as a cooperative project between the Natural Heritage Inventory and the Forest Service. In 1991, a second transplant site was established in suitable habitat. The district has been conducting annual or biennial, late winter/early spring prescribed burns on both sites for enhancement purposes. Based on information from the recent Recovery Plan Amendment, an early growing season burn is planned in FY95. Additional sites are now being evaluated for future transplant efforts.

Three-Toothed Cinquefoil—There has been a decline in the reestablished plants on Brasstown Bald Mountain. The site was grassy, not the normal habitat for this plant. Gradually the plants have not been able to compete with the encroaching vegetation, despite periodic weeding to the site. A naturally-occurring population has been found on a rock outcrop nearby, and is protected due to its location.

Brook Trout—The long-term viability of this species in the Forest is of concern. Distribution is limited to only 10–15 percent of the original range, and local populations are at risk due to the intrusion of rainbow and brown trout.

Forest Fisheries and Wildlife Biologists and Technicians sample many streams on the Forest each year in cooperation with the Georgia Department of Natural Resources Fish Division. Information from these efforts is being used to build a Forest-wide database that will assist in evaluating the status of Brook Trout during the revision of the Forest LRMP.

Rainbow and Brown Trout—Both wild and stocked populations exist on hundreds of

miles of streams in the Chattahoochee. No problems are known with regard to abundance.

Redeye Bass—This species is abundant in cool-water environments. No problems are known.

Turquoise Darer, Yellow Finned Shiner, and Coosa Darter—Populations appear stable from sample data.

Peregrine Falcon—Peregrine Falcon hacking occurred from 1986 to 1992 at Mt. Yonah, Bell Mountain, and Tallulah Gorge in cooperation with the Georgia DNR. A total of 14 birds have been successfully hacked within the Chattahoochee NF. In 1990, one returning Peregrine was observed in the Mt. Yonah area and in late 1991 and early 1992, a pair of Falcons were observed south of Dahlonega. Throughout the eastern U.S., Peregrine Falcon recovery is going well. Hack sites are becoming difficult to find due to birds returning to their own hack sites, a very good sign that the populations are expanding. The peregrine program in Georgia is now in a monitoring phase, attempting to detect and track returning birds to the suitable nest sites (pers. comm., Jim Ozier, Wildlife Biologist, GA DNR Non-game Program).

Pileated Woodpecker—Data collected during the annual Breeding Bird Survey from 1989—1994 indicates Pileated Woodpecker populations are well distributed over the forest and appear to be stable to increasing. Of 16 total routes on the Forest, observers detected Pileated Woodpeckers on all 9 routes of the Chattahoochee, and all but 1 of 7 routes on the Oconee.

Indigo Bunting—The Forest-wide Breeding Bird Survey (BBS) results indicated a possible decline in Indigo Bunting during 1989, 1990, and 1991. The Songbird Point Count surveys conducted during 1992, 1993, and 1994 indicate that Indigo Buntings are detected at locations where sufficient early successional habitat exists. The birds seem to need open areas within forest canopy that include standing dead trees (snags) for perches. As clearcut openings decline over the forest, suitable habitat for these birds is declining as well.

Red-cockaded woodpecker—This species is critically endangered in the Oconee, but ap-

pears stable on the Hitchit Experimental Forest. Management and protection are in accordance with Forest Service policies and procedures, and every effort is made to enhance habitat for expansion.

The augmented colony in Compartment 107 had failed to produce any recruitment since the project began prior to 1989. There were suspected problems with the fertility of the male bird. Since 1989, 20+ eggs have been produced, and two nestlings have fledged. Less than 20 percent of the eggs produced have hatched.

Since Fall of 1994 the adult male has not been observed. However, the adult female and juvenile males have remained with the colony in Compartment 107. They have been observed using both the nest tree and insert trees within the colony. Annual monitoring and rehabilitation of insert and nest trees has been done each February for the Nesting period between April 4 and July 6.

We are considering the possibilities of translocating pairs of birds if they become available, and permission can be obtained.

*Recommendation*—Continue to investigate and monitor the decline of indigo bunting and ruffed grouse populations. Otherwise, no changes needed; monitoring indicates that goals, objectives, management area direction, standards and guidelines are being achieved.